STATE OF CONNECTICUT *v.* JOHN L. SILANO
(AC 25986)

Flynn, C. J., and Rogers and Lavine, Js.

Argued March 28—officially released July 4, 2006

*Martha Brooke Hansen,* special public defender, for the appellant (defendant).

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Mary A. Hults*, former assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, John L. Silano, was convicted, after a trial to the court, on two counts of interfering with an officer in violation of General Statutes § 53a-167a and one count of disorderly conduct in violation of General Statutes § 53a-182 (a) (1).[1] On appeal, the defendant claims that (1) his arrest on April 27, 2002, was illegal because the police lacked probable cause and were acting outside their official capacities due to the use of excessive force, (2) his arrest on December 5, 2001, was unlawful because the officer who decided to arrest him was not present at the time the illegal acts were committed and (3) there was insufficient evidence of his intent to commit the crimes of which he was convicted. We affirm the judgment of the trial court.[2]

I

On appeal, the defendant has raised claims that his arrests with respect to both the December, 2001, and

[1] The defendant was found guilty of interfering with an officer and disorderly conduct under docket number CR01-0175135 (December, 2001 incident) and interfering with an officer under docket number CR01-0178809 (April, 2002 incident). Although the defendant filed an appeal form listing his conviction under the docket number related to the December, 2001 incident only, he asserted and briefed claims related to his convictions in both docket numbers. The state did not file a motion to dismiss the claims related to the April, 2002 incident and submitted a brief addressing the defendant's convictions in both incidents. This court sua sponte ordered the defendant to file a corrected amended appeal form to include his convictions under both docket numbers to conform the appeal to the issues as briefed by the parties.

[2] On August 25, 2004, the defendant was given a one year suspended sentence and a two year conditional discharge with special conditions, i.e., the defendant is to refrain from threatening behavior toward his neighbors, to continue counseling and to provide the court with quarterly reports from his therapist.

April, 2002 incidents were unlawful. In its brief and at oral argument before this court, the state argued in part that those claims are not reviewable because, prior to trial, the defendant failed to question the legality of the arrests by means of either a motion to suppress or a motion to dismiss the charges. We agree with the state that the record is not adequate for review. See *State* v. *Bailey*, 82 Conn. App. 1, 4–5, 842 A.2d 590, cert. denied, 269 Conn. 913, 852 A.2d 744 (2004).

Despite the fact that he did not challenge the lawfulness of his arrests in the trial court, the defendant seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Even if the record were adequate for our review, the state nevertheless properly has noted that even when an arrest is made without probable cause, a subsequent conviction is not void if no evidence was obtained as the result of the illegal arrest.[3] See *State* v. *Fleming*, 198 Conn. 255, 262–63, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). Stated otherwise, the defendant's claim with respect to the April, 2002 arrest is not of constitutional magnitude because the defendant does not claim that the arrest affected his right to a fair trial. Consequently, the claim is not reviewable pursuant to the first and second prongs of *Golding*.

The defendant also contends that his arrest on December 5, 2001, was illegal because the officer who arrested him was not present at the time the misdemeanor acts that formed the basis of the arrest were committed in violation of *State* v. *DelVecchio*, 149 Conn. 567, 573–75, 182 A.2d 402 (1962). This court lacks the requisite factual basis to entertain the defendant's claim, i.e., the identity of the arresting officer.[4] See *State*

---

[3] The defendant does not claim that evidence was obtained pursuant to his arrest.

[4] The state also notes that General Statutes § 54-1f (a) provides in relevant part: "Peace officers . . . shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is

v. *Hamlin,* 90 Conn. App. 445, 451, 878 A.2d 374, cert. denied, 276 Conn. 914, 888 A.2d 86 (2005).

The defendant further claims that the April, 2002 arrest was illegal because the police acted beyond the scope of their official duties for purposes of § 53a-167a. Statutory, nonconstitutional violations, however, are not reviewable under *Golding. State* v. *Smith,* 255 Conn. 830, 843, 769 A.2d 698 (2001).

## II

The defendant's reviewable claim on appeal is that there was insufficient evidence to find him guilty of the crimes of which he was convicted because, considering his claimed intellectual disabilities, he did not possess the intent required under §§ 53a-167a and 53a-182 (a) (1) to justify his conviction. We are not persuaded.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jones,* 92 Conn. App. 1, 6, 882 A.2d 1277 (2005).

"It is well established that the question of intent is purely a question of fact. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because

taken or apprehended . . . *on the speedy information of others* . . . ." (Emphasis added.)

direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, 76 Conn. App. 477, 487–88, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

The defendant's arrests were the consequence of a long brewing boundary dispute between his mother, Angela Silano, and both the prior and current owners of an adjacent residential property. A fence, which had been erected by the prior owner of the adjacent property, at several places extended by inches into Angela Silano's property. Despite a civil action instituted to settle the dispute, in December, 2001, Angela Silano hired a landscaper to cart away sections of the fence as she knocked it down. Lance Bragg, who then owned the adjacent property, telephoned the Trumbull police department for assistance. Bragg gave the responding officer, Timothy Fedor, a statement. Because he did not know the factual background of the dispute, Fedor asked Angela Silano to stop taking down the fence so that an investigation could be conducted. Angela Silano refused to comply.

Up until this time, the defendant had been standing in his mother's yard observing the situation, but when Bragg entered the yard and asked the landscaper to remove pieces of the fence from the truck, the defendant became aggressive. He poked Bragg in the back of the head with his hand. When Bragg turned around, the defendant put his fist in Bragg's face and told him to "get the hell out of here." Fedor saw the defendant

raise his right arm with a clenched fist and heard him swear and direct vulgarities at Bragg. Fedor intervened and told Bragg to return to his porch, which he did. Previously, Bragg had had similar threatening encounters with the defendant and was fearful of him.

The defendant then turned toward Fedor with his fist still clenched and uttered a vulgarity. Fedor felt threatened and radioed for additional police support. According to Fedor, the defendant was acting in a threatening and aggressive manner toward both him and Bragg. Fedor told the defendant to calm down and to go across the street, which he did. When additional officers arrived at the scene, Fedor talked to the defendant to explain the situation and inform him that he was being placed under arrest. The defendant refused to communicate with him. As Fedor approached the defendant to handcuff him, the defendant crossed his arms over his chest. When two officers approached the defendant from either side to place his arms in handcuffs, the defendant intentionally fell to the ground and lay on his stomach with his arms underneath his chest and his hands clenched in fists. The defendant refused to place his hands behind him so that he could be handcuffed. The officers eventually used a bar carried on their utility belts as leverage to free the defendant's arms. After the defendant was handcuffed and placed in a police cruiser, he communicated with the officers and was compliant.

Fedor testified that the defendant's threatening behavior was the basis of his decision to charge him with disorderly conduct. He testified that he charged the defendant with interfering with an officer because, while Fedor had his attention focused on Angela Silano in an effort to get her to stop taking down the fence, the defendant became hostile toward Bragg, and Fedor had to draw his attention away from the unfolding situation regarding the fence and direct it toward the defendant.

On April 27, 2002, the Trumbull police again were requested to come to the scene. Because the officers were aware of the difficulties they had encountered at the Silano residence before, i.e., the defendant intervened when Angela Silano was arrested, four officers responded to the call. When they arrived, Bragg's shirt was wet, and he informed them that he was examining something in his yard when Angela Silano became verbally abusive and sprayed him with water from a garden hose. Philip Hynes, a police sergeant, knocked on the door, and the defendant admitted the officers into the Silano house. Hynes spoke with Angela Silano about the incident. She denied having sprayed water on Bragg, but she turned to the defendant and asked him if she had sprayed water on Bragg. The defendant responded that yes, she had; Bragg was hot and needed to be cooled down. Hynes then informed Angela Silano that she was under arrest. Angela Silano moved away from Hynes and sat on the couch with her hands behind her to make arresting her more difficult. Initially, the officers had informed the defendant not to interfere as Hynes attempted to put handcuffs on Angela Silano. The defendant, however, became irate and yelled that the officers were not going to arrest his mother. The defendant was further enraged when his grandfather attempted to interfere with Hynes during the arrest of Angela Silano. The defendant put his hand out toward Officer Kenneth Jones. Jones pushed the defendant's hand away and told the defendant to stop. The defendant then walked past the officers toward Hynes, raised his hand and lunged at Jones. The officers then told the defendant that he was under arrest for interfering. The defendant fell to the floor and put his hands under his body to prevent the officers from putting him in handcuffs. The officers used pepper spray to subdue the defendant.

At the conclusion of evidence, the court rendered its decision orally. The court stated: "As far as [the

defendant] is concerned, on the December 5 incident, we have the disorderly conduct, and I think [the defendant], through his own statements, and Mr. Bragg testified also that [the defendant] had his fist in Mr. Bragg's face, was threatening to kick his ass. The police then testified about telling [the defendant] to leave, and then his interfering regarding not leaving. And then [the defendant] ends up . . . falling on the ground, and putting his hands under his body so he could not be put in handcuffs and arrested. I find him guilty of interfering and disorderly conduct." Concerning the April, 2002 incident, the court found the defendant guilty of interfering with an officer but not guilty of assault of public safety personnel. The court stated: "His conduct there with the police officer again, and I'm looking at Officer Jones, as far as [the defendant] raising his fist [and] lunging at the officers." The defendant fell to the floor before he was arrested.[5]

---

[5] The court later filed a memorandum of decision. The memorandum stated in part with respect to the December, 2001 incident: "This court found that the defendant . . . poked Lance Bragg in the back of his head and put his fist in the face of Lance Bragg and threatened him. The defendant . . . violated General Statutes § 53a-182 (a) (1) in that with intent to cause inconvenience, annoyance or alarm, [the defendant] engaged in fighting, violent and threatening behavior, and by his offensive behavior and conduct, annoyed and interfered with Mr. Bragg.

"The defendant . . . committed the crime of interfering with an officer in that he became aggressive to Officer Fedor to such an extent that Officer Fedor became frightened and felt threatened. The defendant was asked not to interfere but persisted and raised his fist to the officer and uttered an obscenity toward the officer. [The defendant] was then placed under arrest, but resisted in being handcuffed, falling to the ground and crossing his arms against his chest." The court found that the defendant had violated General Statutes § 53a-167a, interfering with an officer.

As to the April, 2002 incident, the memorandum of decision stated: "This court, after a trial to the court, found the defendant not guilty of assault on a peace officer but guilty of interfering with an officer in violation of § 53a-167a of the Connecticut General Statutes. This court found that on the date in question, the defendant . . . did, in an attempt to prevent the police from arresting his mother, Angela Silano, advance toward the police, and resisted and fought with the police, causing himself and police officers to fall to the ground."

The crux of the defendant's claim on appeal is that because he perceived Bragg and the police as threats to his family, which he sought to protect, he could not have had the criminal intent to commit disorderly conduct and to thwart the police. The defendant testified that he became aggressive toward Bragg and Fedor because he thought Bragg was threatening his mother and the police officer was not doing his job.[6] The defendant, therefore, took it upon himself to protect his

---

[6] The defendant testified in part as follows in response to questions from defense counsel:

"Q: So, your mother told Mr. Bragg not to come on the property. Did Officer Fedor say anything?

"A: Yes, he said it once, but when Bragg walked on the property, he walked right by the officer, totally ignoring the officer at all, and he walked from where he was up to where Pepper's truck was. I would say it is a distance maybe between twenty and forty feet, I would say. And, where I was standing, I was totally amazed that he was ignoring a police officer, you know. And, this cop was just standing there not doing anything, standing there very—just standing there, you know, could have just gave him a book and let him read it. But, he was just standing there not doing nothing. And, I told the officer he should do his job and get this man off my property or I would do it for him.

"Q: And, did you—I guess the officer testified that when you said that you had your fist in the air?

"A: Yes, I had my fist in—

"Q: Is that accurate?

"A: Yes, that is.

"Q: All right.

"A: Because I figured if the officer didn't get him off, then I was well within my rights to throw him off my own property. . . .

"Q: Now, explain why you reacted the way you did to Mr. Bragg coming onto the property? . . .

"A: In the past, he has threatened my mother . . . when he came on the property.

"The Court: Were you there?

"A: Yes, yes. . . .

"The Court: Were the police ever called by your mother?

"A: Yes.

"The Court: Any arrests ever made on Mr. Bragg?

"A: Not on him. Not on him. . . . Not on him at all, so I figured that—I figured because the police couldn't protect my mother, I would have to do it. My other brother is not in the house anymore, so I would protect my mother at any costs.

mother because he viewed that as his responsibility, given the fact that his brother no longer lived at home. Additionally, the defendant argues that because there was testimony at trial that the police were informed of his intellectual limitations, the court could not have found that he had the requisite intent to interfere with an officer and to commit disorderly conduct. With respect to his intellectual abilities, the defendant's counsel asked the defendant to read the criminal information aloud to the court to illustrate his cognitive limitations. The court found that the defendant could read some words and not others, but was presented with no evidence on which to make a finding as to the full extent of the defendant's intellectual capabilities. The fact that there was some evidence of the defendant's intellectual limitations did not require the court to conclude that he was unable to form the requisite intent to commit the crimes of interfering with an officer and disorderly conduct.[7] We conclude, on the basis of the record, that the court drew reasonable inferences from the evidence presented.

A

The defendant challenges the sufficiency of the evidence as to his intent to interfere with an officer in violation of § 53a-167a.[8] "This court has stated that General Statutes § 53a-167a . . . defines interfering to

---

\* \* \*

"Q: Did you swear at [the officer] at this point?

"A: Yes.

"Q: Okay. Why did you swear at him?

"A: Because I figured he wasn't doing his job, and I figured he deserved it."

[7] The record reveals that the defendant did not assert the affirmative defense of lack of substantial capacity to appreciate the wrongfulness of his conduct or to control his conduct pursuant to General Statutes § 53a-13.

[8] General Statutes § 53a-167a (a) provides in relevant part: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties."

include obstruction, resistance, hindrance or endangerment. . . . By using those words it is apparent that the legislature intended to prohibit any act which would amount to meddling in or hampering the activities of the police in the performance of their duties. . . . In enacting [that section], the legislature sought to prohibit the behavior that hampers the activities of the police in the performance of their duties. . . . The statute's purpose is to ensure orderly compliance with the police during the performance of their duties; any act intended to thwart this purpose violates the statute." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 76 Conn. App. 491.

"Upon a verdict of guilty, we review the evidence in the light most favorable to sustaining the verdict. . . . When a verdict is challenged because of insufficient evidence, the issue is whether the [trier] could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Leavitt*, 8 Conn. App. 517, 523, 513 A.2d 744, cert. denied, 201 Conn. 810, 516 A.2d 886 (1986).

In this case, the state presented evidence that on December 5, 2002, the defendant had acted aggressively by raising his fist and uttering obscenities at Fedor, who felt threatened. The defendant also resisted arrest by falling to the ground and placing his clenched fists and arms under his chest. Furthermore, Fedor testified that the defendant's aggression toward Bragg diverted his attention from Angela Silano, who was taking down Bragg's fence. The state also presented evidence that on April 27, 2002, the defendant again tried to come to his mother's aid, failed to follow orders from the police and lunged at an officer. He also refused to cooperate with the police when they attempted to put him in handcuffs.

Although § 53a-167a "does not contain a specific intent element, [this court] previously [has] construed the requisite mental state to include an intent to interfere with an officer by resisting arrest." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 76 Conn. App. 492. We therefore conclude that there was sufficient evidence, including evidence of intent, pursuant to which the court could have found the defendant guilty of interfering with an officer beyond a reasonable doubt.

## B

The defendant finally claims that there was insufficient evidence of his intent with respect to disorderly conduct in violation of § 53a-182 (a) (1).[9] "[T]he crime of disorderly conduct consists of two elements: (1) that the defendant intended to cause, or recklessly created a risk of causing, inconvenience, annoyance or alarm and (2) that he did so by engaging in fighting or in violent, tumultuous or threatening behavior . . . ." (Internal quotation marks omitted.) *State* v. *Leavitt*, supra, 8 Conn. App. 522.

Both Bragg and Fedor testified that they felt threatened by the defendant's behavior, i.e., putting his clenched fist in their faces and voicing obscenities, and Fedor described the defendant's behavior toward Bragg as threatening. By the defendant's own admission; see footnote 6; he intended to take matters into his own hands because Bragg was on his mother's property, and he believed that Fedor was not doing his job. Bragg testified that the defendant poked him in the back of the head, put a fist in Bragg's face and threatened him. The court found that the defendant violated § 53a-182

[9] General Statutes § 53a-182 (a) provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior . . . ."

(a) (1) in that with the intent to cause inconvenience, annoyance or alarm, the defendant engaged in fighting, violent and threatening behavior, and that his offensive behavior and conduct annoyed and interfered with Bragg. On the basis of our review of the record, we conclude that there was sufficient evidence of the defendant's intent to support the court's finding him guilty of disorderly conduct beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.